Alright, Mr. Gonzales. Thank you, Your Honor. In the name of the Court and the Counsel, by this appeal, we raise three points of error. First, I'd like to take the issue of whether the District Court imposed an above-guideline sentence based on protected speech and religious exploration without the required nexus findings under Dawson v. Delaware. Judge, the record as to why the District Court sentenced Mr. Ahmadou to an above-guideline sentence is not clear. During the oral pronouncement, he announced it was a departure multiple times and, in his written statement of reason, he calls it a variance. As the Court knows, under the procedural reasonableness standard, the bill requires, as other cases do, a three-step process, and it is procedurally unreasonable if the District Court doesn't sufficiently explain the basis of its sentence. This is not just methods, Judge, as we know. This is a set of frameworks, in particular the difference between a departure, I argue, under Application No. 4 of the Terrorism Guideline, which requires a specific terroristic motive, and a general discretionary 3553 variance. Due to the ambiguity, I briefed it as though the oral pronouncement controls under Shaw and, in light of the Court's critical finding of no terrorism whatsoever, that's at 1167 of the record, we just find that the above-guideline sentence just can't be supported, and the reason for that is that there needs to be a terroristic motive in order to satisfy that departure, Application No. 4 departure. But I think, you know, in the alternative, if the Judge, if you all, Your Honors, find that it is a variance, given the totality of the record as a whole, Your Honors, I suggest that it is not adequately tied to the 2835 factor, or multiple. The statement of reason checks the general box as to the nature and circumstances and history and tradition. So it doesn't specify whether, and I guess maybe I'm getting ahead of myself, whether what we argue is the constitutional concerns here, under Dawson's Delaware, whether the District Court sufficiently tied or connected the protected conduct to a relevant 3553 factor in that nexus test, or connected it to the crime. How is viewing hundreds of videos of people being beheaded repeatedly protected conduct? Good question, Your Honor. As the Court's noted, and I think we all agree, it's reprehensible and vile content. But it's our position that that's exactly what the First Amendment protects. There's social value in the viewership of this, not the actual content, in terms of protecting national security and the public being aware of the atrocities happening. Well, if that were all there were, I would agree with you, but we have so much more evidence of his intent to engage in jihad. Well, Your Honor, respectfully, I read the record a little different. After the PSR went on and on about his terrorist motives, the District Court found no terrorism whatsoever and denied the adjustment under 3A.1.4, and we argue that in light of that finding, that all district courts deserve, and in light of that finding, the PSR's factual recitation was just not adopted by the District Court. But, you know, the content as vile as it is, I believe it should be honored with First Amendment protections, as well as what the record said about his religious curiosity. Again, he didn't tie it to the gun possession, he didn't tie it to the fact that he's a refractor, so all we have here, in my opinion, is a kind of a moral condemnation of... Well, there was a discussion about potentially buying weapons in the United States and going to Palestine or Israel to harm someone, and perhaps be martyred. The record, again, correct Your Honor, there was discussions about that. Now, we question the context of all this, and discussion is not action, right? So the District Court did not find that Mr. Amadou promoted terrorism, which is a very loose standard. Although, I think it was... Well, he didn't actually promote it, but he was certainly contemplating... And if your question is regarding whether a variance is justified, I can understand that. It's just that procedurally, I had trouble with the record as a whole, finding the difference between whether that shows a future danger, that box wasn't checked. There are those cases, those box checking cases that Your Honors have dealt with, and I just don't see it... What box are you saying wasn't checked regarding future dangerousness? Well, in the statement of reason, there's a sub-box under nature and circumstances or history characteristics that says future danger. There was no discussion of the future danger. All we had was a colloquy during the oral pronouncement that seems as though the judge was offended by the content, which we claim is first amendment protected. Will you speak up, please? Sure, Your Honor. So, moving on, we asked that the court remand this for resentencing so that the court can clarify it on a procedural ground. If the court finds it sufficient, we argue that it's just infected with constitutional violations that call into question the substantive reasonness of the sentence. Your Honors, I move on to issue one in my brief, which is whether the court denied entrapping by estoppel when FBI agents surveyed and controlled the gun shop that misrepresented the law. Your Honors, this circuit has adopted the entrapment by estoppel under FIRES, and it applies if there's an authorized agent of the federal government who has been granted authority to render such advice. Your Honors, Texas Gun Club operates as a federal agent through the ATF licensing system, and that's the conclusion that the Ninth Circuit found in Battlekeep. Of course, you're correct about the Ninth Circuit, but the circuits are split four to one against you on that issue, are they not? I agree, Your Honor. I don't mean that we keep score that way, but the weight of authority is against you. It's significantly against my client's position. This was something he adamantly, through his pro se balance, wanted an opportunity to present to a jury. Your Honor, there is a space, I think. Let's talk about that for a minute. He wanted to present it to a jury. Yes. Had he gone into that, wouldn't that have opened the door to all this terrorism? I agree, Your Honor. I mean, let's be real here. I'm sorry to interrupt, Judge. Yes, absolutely. I mean, that was a concern as I was working through this brief, but I think there is, and that would be very difficult for the district court to figure out, if you remap, however, there is an interesting space here that we may need to carve out. In this particular case, unlike Batterjee, that dealt with just a form, right? I'm not advocating for just somebody filling out a form and then entrapped by a stopper. Apply. I think that the case here is Batterjee Plus because you actually had an active investigation, in my opinion, control over the gunshot. I mean, you had Agent Hole wearing that T-shirt standing five feet away from— Okay, those are factual issues, but let's just get back to the pure question of whether we should adopt the kind of doctrine you're talking about. Absolutely, Judge. Well, first of all, the Supreme Court said, and I don't know how you pronounce it, Rehife, Rehob? Yes. They basically said, and facts are very similar to your case. Very similar. That all the government has to prove is that the alien knows her status or his status, and that the government—then you're in the category, like everybody else, you're presumed to know what the law is. You're presumed to know that you cannot lawfully possess a firearm. And so now you're asking our court to say someone—let's say it's an alcohol distributor instead of a firearms distributor— can lead someone to believe that that's not the law and that's legitimate? And no, Your Honor, this is the concern that I have struggled with in this preparation. I'm not asking for a general Ninth Circuit approach where licenses can become— This is an interesting issue because just returning to that space, look, FFLs are required to fill out that 4473 form, right? But my understanding is that they don't need to do it for temporary gun possession at a gun shop, a rental. But you still are presumed to know that under any set of circumstances you are not to possess a firearm. The law is very clear about that. Ray Heath is very clear on that, Your Honor. And I don't think Ray Heath overturned the Supreme Court cases that deal with entrapping by estoppel. See, that's the concern, and I don't think the circuits have really figured out what to do next. I think creative lawyering in the district courts would probably present this issue in a more clean record here. Which, you know, in the alternative— Well, let's say I'm 20 years old. There's a federal law that says it's against the law for a liquor store to sell liquor to me. And I know it, or I'm presumed to know it. And for whatever reason, the sign isn't displayed that day that it's illegal for me to sell or you to buy alcohol unless you're 21 or over. And I say, well, there's no sign. Right. And they sold it to me, so it must be okay. In that scenario, Your Honor, we don't want to have a case law developed where defendants can take advantage of these kind of quick arguments. However, I don't think there is any oversight. I don't think there is in a temporary gun possession at a gun range. The 4473— Well, again, we're talking about legal matters. But if you want to get into factual matter, I thought there was evidence he went to this particular range because they would not ask for identification. Because the person who actually was a terrorist before he was killed in his terroristic act, that's where he went to practice. Is that correct or not? I don't think that's clear in the record, Your Honor. I don't think I remember that fact being there. Well, someone told him this was the range to go to because I won't check your ID. That was in the record, Your Honor. And I think—well, you know, that's an absolute concern. It's just—this area of law is not simple. It's a confluence of immigration law. It's a confluence of immigration law, criminal law, and ATF regulations. So it's not your typical buy a gun, you're a felon kind of case. And because of that, and in light of rehave, I just—we just don't know what the circuits will do. Because in trying to buy a stop, it's still there. How does it apply here? We ask that there is a small carve-out just for the temporary possession of a weapon here. And we're not asking to excuse his behavior. This is not what we're saying. What we're saying is that he's able to present the reliance, whether the jury figures out whether that's a reasonable reliance. That's a fact question. Now, with my 40 seconds left—well, if you have any more questions on this, I'd love to entertain them. But just quickly, on acceptance of responsibility, Mr. Abadou went to trial really to test this in traffic buy a stop, right? This is—it's clear in the record. You have even the district court at 823 of the record state this is not your typical case where facts are in dispute. Your Honors, we argue that the exception in application of 4 is essentially written for this scenario. Just as in Fels, where the defendant challenged venue, here my client challenged the legal applicability of the law. Thank you. You've saved time for rebuttal. Thank you, Mr. Gonzalez. Ms. Alaniz? May it please the court, Amy Alaniz for the United States. I'd like to start with issue one, the entrapment buy a stop law. There is absolutely no evidence— You need to speak up just a little bit and speak a little bit more slowly, please. There is no evidence in this case that the agents had any control whatsoever over the gun range or any of the employees there. They were there in an undercover capacity because they were very concerned about this young man. He showed all the signs of becoming radicalized. He was in close contact with Adam Alfali, who committed a terrorist act at Purpose Christi Naval Air Station. He was viewing radical Islamic jihadist material online. He had made a trip to the same gun range back in February of 2019. So, of course, they were there. And also, the FBI was worried enough that they introduced a confidential human source to talk to him. And that occurred in early May. So, yes, they were there in an undercover capacity. They later got videos from the gun range that showed him shooting these weapons. But basically, the gun licensee who owned the gun range, he testified that, no, they didn't tell me to do anything other than just go about business as usual. And so the agents were there either on the firing range or they were in the security room that has a one-way mirror. But they did not speak to Mr. Amadou. They did not really interact with him in any way except to be in the same gun range. And that is the crux of the problem, whether or not you want to consider a federal firearm licensee an agent of the government. No one made an affirmative statement here to Mr. Amadou that he could legally possess these guns or use them at the range. If we were to agree with you that a federally licensed firearms dealer doesn't qualify for the term federal official, you have the four circuits that agree with you. Is there any particular one of those four that you would urge us to look to? If not, then you don't have to pick one. I'm just curious. I mean, I think they all essentially get to the same place, you know, for slightly different reasons. And I'm also thinking, they don't reach out. And if I could just talk about Thomas for a minute, this is the Seminole case in the 9th Circuit. That case was handed down in 1987. And one of the premises that the majority based it on, they said, well, these federal licensees have the exclusive right to deal guns. Well, that was before the passage of the Brady Act in 1993. That is when background checks became instituted. And that is also when that same act instituted the so-called gun show loophole, where, you know, if you're a private citizen, you can go to these loopholes, these gun shows, and sell guns, and there's no background check. So I think that one of the premises that Talmadge was based on has changed considerably with the passage of the Brady Act. And if I could go back to the presence of the agents at the range, we have a case from the 5th Circuit in 2001, an unpublished opinion called Mayfield. And they had the same thing going on as there is in this case. And this court found there's no evidence that the agent ever advised the defendant he could legally possess a weapon. In fact, that wouldn't really even work in the 9th Circuit. There's a 9th Circuit case called Shipley. It is unpublished as well from 2019. And the facts were a little unclear. It's a short opinion, but that panel held that an alleged behind-the-scenes participation of a federal official in the defendant's concealed carry permitting process does not suffice to support the defense. So if there are no more questions on Issue 1, I'll move on to Issue 3. I've laid out in my brief in great detail that it was clear that Judge Bennett, he denied the enhancement, the terrorism enhancement. And when the government tried to ask for the sort of application note for kind of that more vague variance, he said, no, I just don't find on this record that he had the required terrorist motivation. And so he moves into basically talking about 3553A factors. And he talks about, well, his close association with the non-terrorists. He talks about, you know, his conversations about preparing for jihad, to go overseas, and to hurt somebody. Jihad means a violent act. And he also talks about his obsessive viewing of his collection of 100 videos of people being beheaded by ISIS. And he did refer to it as a departure twice. But as we know, people use the term departure and variance kind of interchangeably and sometimes not correctly. And I would like to just draw the court's attention to McNeil that I cited in my brief. And it was the same situation. I think it was Judge Boyd in that case. He called it a departure. But in the end, looking at the entire record and the statement of reasons, it was a variance. Briefly on Issue 2, I think the defendant stated in his presentation this morning that Mr. Amadou went to trial to test the estoppel defense. Well, that's not really true. That was all done pretrial. It was addressed many times. He had raised it. He had preserved it. The judge ruled, no, you can't put any of that evidence on. None of that evidence came in at trial. So, no, he did not have to go to trial to preserve an appeal on that defense. And it's very clear when you look at the record as a whole, you know, he really didn't accept responsibility. It's very much like the situation in Sam, the case about the insanity defense. He's basically saying- What was his theory at trial? Why did he go to trial? What was trial? I think the defendant was insisting. Both of his trial orders told him, no, don't do that defense. Because there's some trickiness in our case law about if you enter a guilty plea, you might waive defenses like this. And it might not be clear to a defendant how to thread that needle to plead guilty but reserve certain things for appeal. Well, I think he could always enter the type of plea where you do reserve the right. You know, that might be- I don't know that that was offered again. He was offered a C plea of 30 months, and he refused that repeatedly. But he could have entered a conditional plea and certainly have preserved that. The only case I found from this circuit that allowed the- or I guess they reversed the denial. It was because the defendant went to trial to preserve a venue issue. And that was- there was evidence about that at trial, but it was rejected by the jury. And so that was the only case I found. This is much more like the insanity defense case than the SAM case, where the defendant is basically saying, yes, I did those things that you charged me with, but I'm not culpable because. You know, in SAM it was because I'm insane. Here it's because I was misled by the gun dealer. And so I think it's much more like SAM than any other case. So unless the court has any further questions, I will yield the remainder of my time. The government asks for affirmance in this case. Thank you, Ms. Chalanese. Mr. Gonzalez for a vote. Thank you, Your Honor. I'd like to take a moment just to distinguish the ambiguity in the sentence in McNeil. In McNeil, I think the court determined that it was- I think the court was collusively clear that affairance was the intention of the district court. Here, the constitutional questions, the difference between categorizing it at the oral and the written statement of reason, I don't think it's as clear. And therefore, I don't think that McNeil should apply here. Your Honor, just to answer your question on why my client went to trial, it is a complicated- you know, you can't leave those without a conditional plea, and the record doesn't suggest that there was a conditional plea. It was a big deal to make- just to have it go away, but there wasn't an actual conditional- you see one- I can't remember what the- it wasn't a conditional plea on that. Your Honor, so ultimately, we- returning back to the issue on the constitutional questions, you know, if the government wanted to charge him with terrorism, they could have, right? And they didn't. They charged him with gun possession. And the only reason why we're here talking about these facts is through relevant conduct, right? And this panel decided Kahn not too long ago. And there, you know, the court reversed- this court reversed the decision because there were factual elements of the adjustment that the district court just ignored, right? Here, we don't have that. We have a Dawson v. Delaware question at its heart because, you know, even if there are relevant factors, relevant conduct that can justify this departure or variance, part of the case law as well is that, you know, if the sentence is- if the district court entertains impermissible factors, then it's an unreasonable sentence. And we argue that, you know, these constitutionally protected conduct, religious exploration, the strong First Amendment protection in our country really call into question the sentence. And if the court doesn't have any further questions, I'll yield my time on this. Thank you, Mr. Gonzales. Your case is under submission, and we noticed that your court appointed. We wish to thank you for your willingness to take the appointment and for your resourceful work on behalf of your client.